[No. 1834–3. Division Three. November 28, 1977.]

MERNIS M. ADAMS, *Appellant*, v. FRANCES C. JENSEN–
THOMAS, *Respondent*.

*William C. Harrison,* for appellant.

*Harvey Erickson, Erickson & Erickson,* and *R. Maurice Cooper,* for respondent.

McINTURFF, J.—Both parties appeal from a verdict settling a dispute between them as to property involved in a 4-year affair outside the marriage of one of the parties. We reverse.

In the summer of 1970 the plaintiff, Mernis M. "Buster" Adams, a married man, began seeing the defendant, Frances C. Jensen, a divorced woman. From then until the spring of 1974 he regularly transferred property to her and paid sums of money to her for various expenses. In all,

more than $30,000 was involved. During the term of their relationship the couple did not live together, although they did spend many evenings and weekends with one another, at either the Jensen home or at Sacheen Lake. Nor did they hold themselves out to be husband and wife. In fact, both parties were well aware of the Adams marriage, which continued until May of 1974.

An eventual marriage was discussed by the parties, and Mr. Adams maintains that all of the property transferred to Ms. Jensen was in the contemplation of their marriage and to establish a "nest egg." His failure to earlier dissolve his marriage, however, caused at least one cleavage in their relationship, and, finally, the sometimes stormy affaire de coeur ended in April 1974.

In June 1975 Mr. Adams brought the instant action against Ms. Jensen, seeking a return of the property he had transferred to her and asking damages for the breach of her promise to marry him. He asked that a trust in his favor be declared over the transferred property. A jury trial resulted in a verdict of $4,298 for the plaintiff. He appeals on the grounds that the amount is grossly inadequate and asks this court to impose a trust on the property for him. She cross–appeals from the awarding of any judgment.[1]

Mr. Adams complains of the trial court's failure to impose a trust over the transferred property or, in the alternative, of its failure to order the return of all the property under the theory that it was transferred as a conditional gift. He also alleges as error the trial court's refusal to quash the jury demand, provide special interrogatories to the jury, and enter findings of fact and conclusions of law.

---

[1]He has moved to dismiss her cross–appeal on the grounds that this court does not have jurisdiction to hear it because she has failed to point out any alleged error of the superior court as required by CAROA 42(g)(iii) and CAROA 43 and by RAP 10.3(a)(3) and 10.3(b). While those rules do require that a party on appeal specifically set out assignments of error in his brief, under the circumstances here we are easily able to determine the matters upon which she appeals.

Ms. Jensen appeals from the denial of her motion to dismiss and for a directed verdict, made at the close of plaintiff's case and at the end of trial, and the court's refusal to instruct the jury on the applicable statute of limitations.

Because we believe that the issues raised by Ms. Jensen are dispositive, we first consider the refusal of the trial court to grant her motion to dismiss or for a directed verdict.

■ In considering a motion to dismiss or for a directed verdict, the trial court must construe the evidence and all the inferences most strongly against the moving party.[2] If it can be said as a matter of law that under the evidence so construed that plaintiff cannot possibly recover, then the motion to dismiss should be granted.[3] Because under the facts presented by plaintiff there was no theory upon which he could recover, the trial court erred in denying the defendant's motion for a directed verdict or dismissal.

■ Plaintiff sought to recover the property he transferred to Ms. Jensen under the theory of conditional gift. As a matter of public policy, gifts made between engaged persons cannot be reclaimed upon the dissolution of the betrothal where, at the time the gift was made, either the donor or the donee was then married to another, at least where the parties were aware of the existing marriage. *Armitage v. Hogan*, 25 Wn.2d 672, 171 P.2d 830 (1946); Annot., 46 A.L.R.3d 578 (1972). Thus his claim under this theory was not supportable.

---

[2]The court in *Cherberg v. Peoples Nat'l Bank*, 88 Wn.2d 595, 606, 564 P.2d 1137 (1977), said: "In considering such a motion for directed verdict the court must view the evidence in the light most favorable to the nonmoving party and the motion should be granted, or the denial thereof reversed, only if it can be determined no evidence or reasonable inferences therefrom exist which would be sufficiently substantial to sustain a verdict for the nonmoving party."

[3]*Rhoades v. DeRosier*, 14 Wn. App. 946, 948, 546 P.2d 930 (1976), states: "The motion may be granted only if it can be said that, as a matter of law, no evidence or reasonable inferences therefrom existed to sustain a verdict for the opponent. If substantial evidence supports the nonmoving party's position, the motion must be denied and the case submitted to the jury."

 Nor is the breach of promise theory available to the plaintiff here.

A promise of marriage made by or to a person who, to the knowledge of the parties concerned, then has a spouse living *is absolutely void* in its inception and cannot give rise to an action for its breach, even though such promise is not to be performed until after the death of, or divorce from, such spouse. Such contracts are in violation of the marital duty and are contrary to morality and public policy.

(Italics ours.) *Jones v. Allen,* 14 Wn.2d 111, 119, 127 P.2d 265 (1942). Hence, neither of the legal theories pursued by Mr. Adams is applicable here because of his marital status during the time of his relationship with Ms. Jensen.[4]

Nonetheless, Mr. Adams contends that the cases which have carved out "exceptions"[5] to the rule of *Creasman v.*

---

[4]Parenthetically, we note that in giving instruction No. 5, the trial court failed to consider the Adams marriage. That instruction reads: "You are instructed that to recover in this action plaintiff must establish by a preponderance of the evidence the following elements:

"That an agreement was made in contemplation of marriage to accumulate certain property by the parties and was mutually accepted by them and that such agreement was to be fulfilled when the parties were competent to do so and that the property transferred or the money supplied by plaintiff to the defendant was given in consideration of such agreement.

"That the defendant breached such agreement and that as a proximate result of such breach, if any, by the defendant, the plaintiff has been damaged as claimed."

[5]The court in *Latham v. Hennessey,* 87 Wn.2d 550, 553-54, 554 P.2d 1057 (1976), said:

We also have developed numerous exceptions to the *Creasman* presumption in order to avoid inequitable results. These exceptions include: (1) implied partnership or joint venture, *In re Estate of Thornton, supra* [81 Wn.2d 72, 499 P.2d 864 (1972)] at 78-81; (2) constructive trusts, *Humphries v. Riveland,* 67 Wn.2d 376, 407 P.2d 967 (1965); (3) resulting trusts, *Walberg v. Mattson,* 38 Wn.2d 808, 232 P.2d 827 (1951); and (4) express or implied contract to make a will, *In re Estate of Thornton, supra* at 76.

(Footnote omitted.) Compare the comments above with those of another author in Continuing Legal Educ. Comm., Wash. State Bar Ass'n, *Washington Community Property Deskbook* § 2.7 (1977):

The exceptions appear only to define the various legal theories employed to characterize the property relationship between the parties in a non-marital cohabitation situation. The use of the word "exception" however, is confusing.

*Boyle,* 31 Wn.2d 345, 353, 196 P.2d 835 (1948) (*i.e.,* accumulated properties belong to one in whose name legal title stands), will allow him to recover. He suggests the facts are such to require a tracing of the property and its return to him under the theory of *West v. Knowles,* 50 Wn.2d 311, 311 P.2d 689 (1957). Alternatively, a resulting trust in his favor should be found by applying *Walberg v. Mattson,* 38 Wn.2d 808, 232 P.2d 827 (1951). Finally, he maintains that a constructive trust is applicable on the strength of *Omer v. Omer,* 11 Wn. App. 386, 523 P.2d 957 (1974), and *Proctor v. Forsythe,* 4 Wn. App. 238, 480 P.2d 511 (1971). He does not seek to impose a cotenancy[6] or rely upon an implied partnership or joint venture.[7]

██ ██ In this case, these contentions are without merit. General equity principles do not support his request for trust relief nor do the rules which have emerged from the other meretricious relationship cases.[8] The facts here differ markedly from them in that *the parties did not live together in a stable, long–term relationship nor did they hold themselves out to be husband and wife.*

If the presumption is rebuttable no "exception" is necessary since it may be overcome by evidence. If the presumption is conclusive and a rule of law, then "exceptions" to its application are the only method of avoidance.

[6]*See Shull v. Shepherd,* 63 Wn.2d 503, 387 P.2d 767 (1963); *Iredell v. Iredell,* 49 Wn.2d 627, 305 P.2d 805 (1957).

[7]*See In re Estate of Thornton,* 81 Wn.2d 72, 499 P.2d 864 (1972).

[8]*E.g., Latham v. Hennessey,* 87 Wn.2d 550, 554 P.2d 1057 (1976); *In re Estate of Thornton,* 81 Wn.2d 72, 499 P.2d 864 (1972); *Humphries v. Riveland,* 67 Wn.2d 376, 407 P.2d 967 (1965); *West v. Knowles,* 50 Wn.2d 311, 311 P.2d 689 (1957); *Creasman v. Boyle,* 31 Wn.2d 345, 196 P. 2d 835 (1948); *In re Estate of Thornton,* 14 Wn. App. 397, 541 P.2d 1243 (1975), *rev. denied,* 86 Wn.2d 1009 (1976); *Omer v. Omer,* 11 Wn. App. 386, 523 P.2d 957 (1974); *Proctor v. Forsythe,* 4 Wn. App. 238, 480 P.2d 511 (1971).

Professor Harry M. Cross, in *The Community Property Law in Washington,* 49 Wash. L. Rev. 729, 744 (1974), opines:

Where the parties have engaged in a casual relationship, *e.g.,* where they meet on Thursday nights, lack of *intention* to establish a long–term meretricious relationship easily may be inferred. In these kinds of relationships, neither party can reasonably expect to share in the other's acquisitions, nor have the joint efforts of the parties contributed to the property accumulations of either, and thus it would simply be unfair for the court to divest the title party

Indeed in *Walberg v. Mattson, supra,* the court did find a resulting trust in favor of a married man who had lived with a divorced woman and her children for several years. And, the trust was found despite the divorced woman's contentions that it was illegal as a fraud upon the man's wife and because the parties were living in illicit cohabitation. Both theories were raised for the first time on appeal, and the court said:

> Respondent's contention that the trust must fail because it was established for an illegal purpose, to–wit, to enable the parties to continue to live in illicit cohabitation, is also unsupported by authority. No case has been cited by respondent holding that a resulting trust between persons living in illicit cohabitation *ipso facto* fails for illegality.
>
> It is not asserted, nor does the record show, that the conveyance was for the purpose of inducing or prolonging illicit cohabitation. All that is shown is that appellant purchased the property, title was taken in respondent's name, the parties were illicitly cohabiting, and that they used the property as a home for themselves and two of respondent's children. It is sufficient to say that these facts do not establish any illegality militating against the enforcement of this trust.

*Walberg v. Mattson,* 38 Wn.2d 808, 816, 232 P.2d 827 (1951).

While there are similarities between *Walberg* and the facts here in that the man in both cases was married and that neither couple held themselves out to be husband and wife, there are critical distinctions that militate against finding a resulting trust here. First, the plaintiff in *Walberg* had been legally separated from his wife for nearly 20 years at the time of the trial; here Mr. Adams continued to live in the same house with his wife. Secondly, in *Walberg* the trial court found clear, cogent and convincing evidence that the property acquired by the parties while they were living

---

of ownership. Hence, it is reasonable to assume that the court will continue to apply the *Creasman* presumption to the short term meretricious relationship.

For a discussion of the significance of a *long–term and stable* relationship, see 48 Wash. L. Rev. 635, 640–43 (1973).

together was acquired with the plaintiff's funds and that the title was placed in defendant's name to avoid any complications in future transfers. Here there is no such finding.

The only evidence which would support a trust theory is Mr. Adams' testimony regarding a check he gave to Ms. Jensen following a break in their affair. He testified the check was given to her to take care of her in the event of his death because he knew his wife would be able to obtain the rest of his assets. It was with that check that Ms. Jensen apparently purchased the Cadillac. He also said he had maintained continuing contacts with employees of a local Cadillac dealer over a period of years. We note that he did not inquire about the check until long after the affair ended. When asked if he and Ms. Jensen immediately afterwards started having sexual relations again, he answered, "Nope. Not right at that time. A couple of days later."

■ Whether we can independently determine if the necessary clear, cogent and convincing quantum of proof[9] exists has been answered in *In re Sego,* 82 Wn.2d 736, 739–40, 513 P.2d 831 (1973):

> We are firmly committed to the rule that a trial court's findings of fact will not be disturbed on appeal if they are supported by "substantial evidence". *Sylvester v. Imhoff,* 81 Wn.2d 637, 503 P.2d 734 (1972). Nevertheless, evidence that may be sufficiently "substantial" to support an ultimate fact in issue based upon a "preponderance of the evidence" may not be sufficient to support an ultimate fact in issue, proof of which must be established by clear, cogent and convincing evidence. *See In re Estate of Reilly,* 78 Wn.2d 623, 640, 479 P.2d 1 (1970). Thus, the question to be resolved is not merely whether there is "substantial evidence" to support the trial court's ultimate determination of the factual issue but whether there is "substantial evidence" to support such findings in light of the "highly probably" test.

[9]*See In re Estate of Spadoni,* 71 Wn.2d 820, 822–23, 430 P.2d 965 (1967) (resulting trust); *Humphries v. Riveland,* 67 Wn.2d 376, 390, 407 P.2d 967 (1965) (constructive trust).

. . . Our duty, on review, is to determine whether there exists the necessary quantum of proof to support the trial court's findings of fact and order of permanent deprivation.

(Footnote omitted.)

Thus, applying the rule in *In re Sego, supra*—assuming a bench trial and that the trial court would have found sufficient evidence to support the theories of constructive or resulting trust—we would not, and do not, find the necessary quantum of proof to establish either.

Furthermore, while there may not have been evidence to show that the property transfers in *Walberg* were not made to induce or prolong the illicit relationship between the parties, there is, at least as to some of the property, evidence here that it was transferred in order to keep the relationship intact. Ms. Jensen testified that, following the temporary schism in their affair, she and Mr. Adams met at a Spokane Valley restaurant for "a drink or two." She related the following conversation:

> He was begging me to let him come back again and I said I want no—I want no part of it, have you gotten your divorce, have you filed for divorce, are you still living in Alice's basement, yes, I'm still in the basement, and so I haven't done anything about it. But I got to have you back. I said, well, I'm not going to go back into this. It's—it's not right, and I haven't been proud of it. And I'm not going to live like that. Well, I got to have you back. I said well, by then after two drinks, I said all I have been is a kept woman and that's all the heck it ever amounted to. All you—my friends have told me you had no intention of marrying me and it's true, you're not going to get a divorce and you still want me back. Well, I just can't stand it. I said half in jest, and half in reality, I said, if I'm going to be a kept woman I'll be kept in style, and you can buy me a new Cadillac and pay off the mortgage and on the great big house I don't want. He says, I'll do it. I'll do it. Three days later we went up to Brewster and he got the check out and signed it and gave it to me and told me to go buy the Cadillac. I don't know what all that is about in trust. You bought me a Cadillac to get back in my bed, Buster.

Also, there is a significant difference in the illegitimacy of the relationships. In *Walberg* the plaintiff had been separated for a considerable length of time from his wife; here, Mr. Adams remained married and living with his wife until after his affair with Ms. Jensen was over. While neither type of relationship can be condoned,[10] we find fewer equities in favor of Mr. Adams.

■ Finally, we reject Mr. Adams' request to trace the assets involved and award them to either of the parties as. was done in *West v. Knowles, supra.* That case is inapposite. There the couple lived together for 10 years, holding themselves out to the world as husband and wife. Again, the stability of the relationship is distinguishable from the surreptitious situation presented here. So, too, are the expectations of the parties. *In this clandestine relationship, which is necessarily unstable because of the existing marriage of one of the parties,* the trial court's remarks are

---

[10]Justice Finley, concurring specially in *West v. Knowles,* 50 Wn.2d 311, 315–16, 311 P.2d 689 (1957), noted appropriately:

The majority opinion indicates that for ten years Bonnie West and Delmer Knowles lived together and were generally accepted as a married couple. However, they had never observed the usual conventions of (a) obtaining a marriage license and (b) formally exchanging marriage vows. *Obviously, such a relationship is not generally approved by the mores of our society. It is not a relationship which is encouraged by the courts.* Be that as it may, some of our citizens of the opposite sex occasionally become involved in a relationship such as that in the instant case.

(Italics ours.)

We note that the increase in the number of couples living together without marriage was recognized by the Supreme Court of California in *Marvin v. Marvin,* 18 Cal. 3d 660, 665, 134 Cal. Rptr. 815, 818, 557 P.2d 106, 109 (1976), where the court, in footnote 1, said:

"The 1970 census figures indicate that today perhaps eight times as many couples are living together without being married as cohabited ten years ago." (Comment, *In re Cary: A Judicial Recognition of Illicit Cohabitation* (1974) 25 Hastings L.J. 1226.)

We need not comment on such living arrangements beyond what was said by Justice Finley. We do, however, find it necessary to establish that the kind of adulterous behavior in this case is more offensive to society's mores than the stable, long–term relationship where the parties innocently or not, hold themselves out to be husband and wife. This court does not condone or encourage any conduct which weakens, if not destroys, an existing marital community and family life.

apropos: "Neither can have participated in this type of an experience and not expect to take the risks or pay the price involved."

Judgment of the Superior Court is reversed; plaintiff's complaint is dismissed.

MUNSON, C.J., and GREEN, J., concur.

Petition for rehearing denied February 27, 1978.

Review by Supreme Court pending July 21, 1978.